**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JAIME HOYOS,
             *Petitioner-Appellant*,

v.

RONALD DAVIS, Warden, California
State Prison at San Quentin,
             *Respondent-Appellee.*

No. 17-99009

D.C. No.
3:09-cv-00388-
L-NLS

OPINION

Appeal from the United States District Court
for the Southern District of California
M. James Lorenz, District Judge, Presiding

Argued and Submitted March 23, 2022
Pasadena, California

Filed September 2, 2022

Before:  Sandra S. Ikuta, Morgan Christen, and
Patrick J. Bumatay, Circuit Judges.

Opinion by Judge Christen;
Concurrence by Judge Ikuta

**SUMMARY**[*]

---

### Habeas Corpus/Death Penalty

The panel affirmed the district court's denial of a habeas corpus petition brought by Jaime Hoyos, who was sentenced to death in 1994 after a state jury convicted him of first-degree murder and other offenses.

In the opinion, the panel affirmed the district court's denial of Hoyos's certified claim that the prosecutor's use of peremptory challenges violated his Fourteenth Amendment right to equal protection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986).

*Batson* established a three-step framework for trial courts to evaluate claims that a prosecutor's peremptory strikes were racially discriminatory. Step One: the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Step Two: once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Step Three: if a race-neutral explanation is tendered, the trial court must then decide whether the opponent of the strike has proved purposeful racial discrimination.

Hoyos argued the California Supreme Court's decision was an unreasonable application of *Johnson v. California*,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

545 U.S. 162 (2005), under 28 U.S.C. § 2254(d)(1) because the state court "engaged in the prohibited exercise of reviewing the trial court record regarding the struck jurors and identifying colorable reasons why the prosecutor might have legitimately struck the three jurors." The panel held that the California Supreme Court unreasonably applied *Johnson* by doing exactly what this court has explained *Johnson* forbids: the court scanned the record, articulated its own race-neutral reasons why the prosecutor may have exercised his peremptory strikes, and denied Hoyos's claim at Step One. Noting that Hoyos cited no Supreme Court authority requiring a state court to conduct a comparative juror analysis at Step One, the panel held that the California Supreme Court did not violate clearly established federal law by failing to do so.

Because the California Supreme Court unreasonably applied *Johnson*, the panel reviewed de novo Hoyos's *Batson* claim to determine whether he raised an inference of racial bias at Step One. To establish a prima facie case at Step One, Hoyos bore the burden to show: (1) he is a member of a cognizable group; (2) the prosecutor removed members of that group; and (3) the totality of the circumstances gives rise to an inference that the prosecutor excluded jurors based on race. The parties did not dispute that Hoyos—who argued that his equal protection rights were violated because the prosecutor struck "all three Hispanic female prospective jurors"—met his burden as to the first two elements: it is undisputed that Hoyos is a member of a cognizable group (i.e., Hispanic individuals) and that the prosecutor peremptorily removed members of that group. The panel noted that trial courts are often well-situated to decide the Step One question without conducting a formal comparative juror analysis, but wrote that when an appellate court must

decide whether the trial court that denied a *Batson* motion should instead have drawn an inference that discrimination occurred, *Batson* supports the use of comparative juror analysis. Engaging in such an analysis, the panel concluded that a comparison of the struck jurors to the seated jurors undermines any inference of racial bias. Accordingly, pursuant to *Batson*'s three-step framework, the panel could not say the California Supreme Court erred by ruling that Hoyos did not make a prima facie showing to shift the burden to the prosecutor to explain the actual motivation for the peremptory challenges.

The panel addressed Hoyos's six other certified claims in a simultaneously filed memorandum disposition and affirmed the district court's rulings on those claims. The panel declined to reach Hoyos's uncertified claims.

Judge Ikuta, joined by Judge Bumatay, concurred. Judge Ikuta wrote that the majority's holding—that the California Supreme Court's rejection of Hoyos's *Batson* claim was an unreasonable application of clearly established Supreme Court precedent, which relieves this court of deference to the state court's opinion under the Antiterrorism and Effective Death Penalty Act of 1996—is untrue because there is, in fact, no Supreme Court case squarely on point. She wrote that there is, instead, a Ninth Circuit opinion, *Currie v. McDowell*, 825 F.3d 603 (9th Cir. 2016), that merely *claims* this circuit's rule—that a trial court may not deny a *Batson* motion at step one based on evidence supporting race-neutral reasons for the challenges—is clearly established Supreme Court precedent. She joined the opinion's analysis in full because the panel is bound by *Currie* to the extent it holds that a rule has been clearly established by Federal law as

determined by the Supreme Court, even if that precedent was plainly wrong.

## COUNSEL

Mark F. Adams (argued), San Diego, California; Eric S. Multhaup, Mill Valley, California; for Petitioner-Appellant.

Anthony Da Silva (argued) and Lise S. Jacobson, Deputy Attorney General; James William Bilderback II, Senior Assistant Attorney General; Rob Bonta, Attorney General; Attorney General's Office, California Department of Justice, San Diego, California; for Respondent-Appellee.

## OPINION

CHRISTEN, Circuit Judge:

Jaime Hoyos was sentenced to death in 1994 after a state jury convicted him of first-degree murder and several other offenses. He appeals the district court's denial of his federal habeas corpus petition filed pursuant to 28 U.S.C. § 2254. Hoyos raises several certified claims on appeal and also asks us to consider three uncertified claims. We affirm the district court's denial of Hoyos's petition based on his claim that the prosecutor's use of peremptory challenges violated his Fourteenth Amendment right to equal protection pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986). Hoyos's *Batson* argument reflects a misunderstanding of our prior caselaw that warrants additional discussion, and we address it in this published opinion. We address Hoyos's six other certified claims in a simultaneously filed memorandum disposition and

affirm the district court's rulings on those claims. We decline
to reach Hoyos's uncertified claims. *See* Ninth Cir. R. 22-
1(e).

I

Hoyos and his brother-in-law and co-defendant Jorge
Emilio Alvarado were found guilty of murdering Daniel and
Mary Magoon in their San Diego County home in 1992. In
a joint trial held in March 1994, Hoyos and Alvarado were
each convicted of two counts of first-degree murder pursuant
to section 187 of the California Penal Code. They were
acquitted of attempted murder but convicted of assault with
a firearm for injuring the Magoons's three-year-old son. The
co-defendants were also convicted of conspiracy to commit
robbery, first-degree robbery, burglary, grand theft of a
firearm, and transporting over 28.5 grams of marijuana in
violation of the California Health and Safety Code.

The jury returned a verdict of life without the possibility
of parole for Hoyos's murder of Daniel Magoon, and death
for the murder of Mary Magoon. The trial court denied
Hoyos's motions for a new trial and to modify the penalty
verdict, and imposed a death sentence.

A

Hoyos's *Batson* claim centers upon the prosecution's use
of peremptory strikes against three Hispanic prospective
jurors: Margaret A., Lisa H., and Yolanda M.[1] During voir

---

[1] The district court referred to each member of the jury venire by their
first and last initials, following the California Supreme Court's practice on

dire, the judge questioned Margaret A. about her English language skills, following up on her response to the juror questionnaire, which asked whether the case was one "on which [she] would like to serve as a juror." Margaret A. wrote, "Not enough English." Margaret A. also selected "Yes" for questions asking whether she had trouble understanding or speaking English and whether she spoke and understood Spanish. A subsequent question on the form asked whether Margaret A. would "be *unable* to set aside [her] interpretation [of testimony] and accept that of the Court translation." Margaret A. again answered, "Yes."

Margaret A. told the judge she understood the questionnaire, but "I don't speak English that well and I don't understand a lot of words that you are saying." In response to questions from Hoyos's counsel, she responded that Spanish was her primary language, and she said she could not describe the meaning of the words "aggravating," "mitigating," or "evidence," though she understood the meaning of those words. The judge asked Margaret A. whether she would be comfortable interrupting the proceedings to get clarification on the meaning of a word, to which Margaret A. responded: "I don't know. I get real nervous when I come to English. I think I be very nervous then. I try to speak." The trial judge later asked her if she would "be liable to just let it kind of pass" if she did not understand something, and Margaret A. said, "I probably will, yes." Hoyos's counsel challenged Margaret A. for cause based on her difficulty with understanding English, and the prosecutor joined defense counsel's challenge. The trial court declined to excuse Margaret A. for cause but told the parties

direct appeal. We refer to each individual by her first name and last initial.

that they could "deal with" Margaret A. using peremptory challenges.

Prospective juror Yolanda M. wrote on her questionnaire: "I don't feel I could be part of a jury, if they impose the death penalty." During voir dire she explained, "What it comes down to, I just have strong religious beliefs deep down inside." But she also told Alvarado's counsel during voir dire questioning that she thought she could put her views aside.

The prosecutor asked that Yolanda M. be removed for cause, explaining he did not believe she could impose a death sentence. Hoyos's counsel opposed the request and argued that Yolanda M. "did change her mind to some degree" about her ability to impose the death penalty. The trial court denied the challenge for cause, reasoning: "She wouldn't like it, but she will follow the instructions and if called upon can serve as a juror in this case."

Prospective juror Lisa H. wrote on her juror questionnaire that she "believe[d] in the death penalty (and the justice system) but only in certain instances." She also wrote that she was "not certain what benefit [the death penalty] does for society by executing someone." During voir dire she told the trial court that the companion of "a very very close friend, like family" was killed in a drive-by shooting less than a year before voir dire and disclosed that the experience had "affected" her.[2] In response to this disclosure, the judge asked Lisa H. whether she had any quarrel with the principles

---

[2] It appears Lisa H. disclosed her recent experience involving a shooting on her questionnaire in response to the question, "Do you have any family members or close friends who have been the victim of a violent crime?"

or rules of law that he had described, and Lisa H. said: "Well, I tend to side with the [sic] life in prison as opposed to death penalty," but she also said she could "keep an open mind." The court followed up by asking Lisa H.:

> Q: Do you feel that you would be capable of returning . . . a [death] verdict?
>
> A: I think I can, but I would have to be real convinced that it outweighed it heavily.
>
> Q: Could you keep an open mind?
>
> A: (No audible response.)
>
> Q: Now, some people have told us that they can, and some people have told us that they can't. Again, I respect all opinions. Can you tell me how you feel about that.
>
> A: I think I can, but I would have to be real convinced that it outweighed it heavily.

Later the prosecutor questioned Lisa H.:

> Q: Ms. H[], going to the same question on the death penalty, you stated to his honor as to questions regarding that, that [sic] in order to impose the death penalty, you would have to be real convinced that that was the appropriate punishment. Would you be placing any particular burden upon the prosecution, myself, or the defense to convince you one way or another?

A: Prosecution.

Q: So even though his honor has indicated I
don't have a burden in a penalty trial, you
would place a burden on me to convince you
that they should die?

A: Well, I guess I answered that incorrectly.
I would have to be convinced of the evidence,
of everything all together. That's what I
mean.

The record does not indicate whether Lisa H. was challenged
for cause.

After the court's dismissals for hardship and for cause, it
selected forty-two prospective jurors from a venire panel of
seventy-nine.[3]    The prosecution was allowed thirty
peremptory challenges, and Hoyos and Alvarado were
allowed twenty joint peremptory strikes and five individual
peremptory challenges each. The prosecutor used his fifth
peremptory strike to remove Margaret A. Alvarado's counsel
requested a side-bar, which the court postponed until a later
time. The prosecution then used its sixth peremptory
challenge to strike Lisa H. After the prosecution exercised
two more strikes and the defense exercised one, the parties
accepted the jury, and it was sworn in. The parties then
selected six alternates. Both sides exercised one peremptory
challenge, and Alvarado's counsel returned to his objection

---

[3] There were eighty-one veniremembers remaining after dismissals for
hardship and cause, but the court dismissed two additional jurors before
the parties began exercising their peremptory strikes.

regarding the prosecutor's use of a peremptory challenge to remove Margaret A.

Alvarado's counsel cited *People v. Wheeler*, 583 P.2d 748 (Cal. 1978), and argued the prosecution's peremptory strike was racially discriminatory because Margaret A. was "of Mexican ancestry," like the defendants.[4] Alvarado's counsel also asked to "put on the record" that he "was thinking of making the same objection" for the prosecution's strike of Lisa H. The court agreed to take up the motion "at a convenient time."

The court then brought in the remainder of the prospective jurors, and the parties jointly exercised another eighteen peremptory strikes. Eight of the eighteen prospective alternates excused on peremptory strikes were removed by the prosecution, including Yolanda M. The alternates were sworn in, and Alvarado's counsel moved to add Yolanda M. to the *Wheeler*/*Batson* motion. It appears from the trial court's transcript that the court granted Alvarado's motion to include Yolanda M. in the *Batson* challenge.

The trial court heard argument on the *Wheeler*/*Batson* motion after all the jurors and alternates had been selected.

---

[4] "A *Wheeler* motion is considered the procedural equivalent to a challenge made under *Batson*." *Williams v. Runnels*, 432 F.3d 1102, 1103 n.1 (9th Cir. 2006); *see also People v. Cornwell*, 117 P.3d 622, 632 (Cal. 2005) ("Exercising a peremptory challenge because of group bias rather than for reasons specific to the challenged prospective juror violates both the California Constitution and the United States Constitution." (quoting *People v. Cleveland*, 86 P.3d 302, 321 (Cal. 2004))), *abrogated on other grounds by People v. Doolin*, 198 P.3d 11, 36 n.22 (Cal. 2009).

Alvarado's counsel presented a brief argument in support of the motion:

> I indicated before we broke that the three jurors, [Margaret A., Lisa H., and Yolanda M.,] were of Mexican ancestry . . . I think the record I made before was also clear in that I said my client was of the [same] cognizable class. *Batson* talks a little bit later after those being part of the first prong, second prong showing that p[er]emptory challenges is a jury selection technique in which improper motives could be exercised. I don't think I have to put on any proof or make an offer of proof to that.
>
> And finally, the third prong is these facts, I suppose referring to the facts I have just recited, and any other relevant circumstances that raise an inference that the prosecutor used to exclude these people from the petit jury on account of race.
>
> In support of that I will incorporate their statements in court, their answers to the questionnaire, and submit it on that.

Hoyos's counsel joined the motion but did not offer any additional reasons or arguments to support the defendants' prima facie showing. The prosecutor briefly expressed that defense counsel had not made a prima facie showing and noted that one of the twelve jurors who was seated before the *Wheeler/Batson* motion, and one alternate, were Hispanic. The court denied the *Wheeler/Batson* motion:

I am mindful of the fact that on the jury we have [Pablo G.] who is a Hispanic. Other members of other minority groups are on the jury. I believe there are two African/American representatives on the jury. I look at the record of these individuals and based on what I have in front of me, [Margaret A.], for example, she indicated, frankly, it would be very difficult for her to serve as a juror in this case because of the inability that she said she has to speak English. . . .

She was not excused statutorily as a matter of hardship. But one can certainly see under those circumstances such a juror may have a great degree of difficulty with such a complex case such as this and a case involving the length of trial, the number of witnesses, and the magnitude of these issues. She said that she wasn't comfortable with doing it. She said she didn't want to do it, in effect. And I can see based upon that the exercise of a peremptory.

And *I am not inquiring of the prosecution right now*, but I can see good reasons why one would want to excuse such a person from service on the jury in view of the problems with the English language, spoken and understanding.

As to the next juror, . . . [Yolanda M.] indicated to the court . . . in her questionnaire

that she, in fact, had a conscientious objection to the death penalty. She indicated orally she would be able to keep an open mind.

But the prosecution has the right to exercise peremptories as to individuals who have feelings pro or con so far as the death penalty is concerned. I didn't see anything about . . . this juror, her being excused that causes me to think she was excused for purposes of race.

The last juror is [Lisa H.]. . . . [She] was asked by the court if she had any quarrel with the principles of law that we discussed concerning capital punishment, and she said during the course of oral inquiry that she would tend to side with life in prison rather than the imposition of a death sentence essentially.

Observing the manner [in] which all of these jurors were questioned by the prosecution, the extent of the questioning, the use of these p[er]emptories, the presence of at least one Hispanic on the panel, . . . it seems to me that there really isn't anything from which I could reasonably find the exercise of p[er]emptories based upon race. Some attempt to exclude Hispanics, that doesn't seem to be the case at all in each of these cases.

It seems to me that a reasonable individual would be inclined to perhaps exclude these jurors on matters solely independent of race. I just don't see it. And I feel that there isn't

really any type of substantial showing at all of
the use of p[er]emptories based upon race. *So
I find there is not a prima facie showing*.

The case proceeded to trial and defendants were convicted
of first-degree murder and several other felonies. Hoyos
raised several claims on direct appeal to the California
Supreme Court, including a *Batson* claim alleging that the
prosecutor's use of peremptory challenges to strike three
Hispanic prospective jurors violated his Fourteenth
Amendment right to equal protection. The California
Supreme Court affirmed Hoyos's conviction and sentence.
*See People v. Hoyos*, 162 P.3d 528, 536 (Cal. 2007). As to
Hoyos's *Batson* claim, the state supreme court rejected
Hoyos's argument that he had established a prima facie case
of racial bias. *Id.* at 551. The court cited *Johnson v.
California*, 545 U.S. 162 (2005), but also specified that it
would affirm the trial court's ruling on the *Batson* claim
"where the record suggests grounds upon which the
prosecutor might reasonably have challenged the jurors in
question." *Hoyos*, 162 P.3d at 550.

Specifically addressing the prosecutor's strike of
Margaret A., the California Supreme Court concluded the
record demonstrated that both the prosecution and defense
"were reasonably concerned about the prospective juror's
English language skills and, on this basis, the prosecutor was
entitled to excuse her." *Id.* The state court went on to
conclude the prosecutor was entitled to excuse Lisa H.
because "[t]he record strongly suggests the prosecutor had
grounds for concern about her possible bias against the death
penalty." *Id.* at 552. Last, the court explained "[t]he record
suggests the prosecutor had reason for concern about

[Yolanda M.'s] possible bias against the death penalty, and on this basis, he was entitled to excuse her."[5]  *Id.*

## B

After his first state habeas petition was summarily denied, Hoyos filed a federal habeas petition in the District Court for the Southern District of California.  The district court stayed proceedings to allow Hoyos the opportunity to exhaust all of his claims in state court, and the California Supreme Court summarily denied Hoyos's second petition.  Hoyos then filed a second amended habeas petition in federal court.  The district court denied the State's request to dismiss certain claims on the basis of state procedural bars, denied Hoyos's request for an evidentiary hearing, and denied Hoyos's petition.  *See Hoyos v. Davis*, No. 09cv0388 L, 2017 WL 4409437 (S.D. Cal. Oct. 4, 2017).

The district court concluded that the California Supreme Court's rejection of Hoyos's *Batson* claim was not an unreasonable application of clearly established Supreme

---

**[5]** The California Supreme Court also rejected Hoyos's argument that he demonstrated a prima facie case of discrimination based on the cognizable class of Hispanic *women* and on Hoyos's theory that most Hispanic women oppose the death penalty so disqualification of a Hispanic woman on those grounds "would constitute improper bias against this group."  *Id.* at 552.   Hoyos mentions, but does not substantively argue, his group bias theory in his briefing before our court.  Therefore, this argument is forfeited.  *See* Fed. R. App. P. 28(a)(8)(A) (stating that argument on appeal must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

Court precedent.[6]   The court explained that the state court "correctly recognized and articulated the controlling Supreme Court authority" from *Johnson v. California*, 545 U.S. 162 (2005), and "determine[d] 'whether the record supports an inference that the prosecutor excused a juror on the basis of race.'"   The district court also rejected Hoyos's argument that the state court's decision was based on an unreasonable determination of the facts, and rejected Hoyos's contention that the state court violated clearly established federal law by failing to conduct a comparative juror analysis.   The district court acknowledged that comparative juror analysis "is an established tool at step three of the *Batson* analysis," and that it may be used at *Batson*'s first step to assess whether a prima facie showing is made.   But after conducting its own comparative juror analysis, the district court concluded the comparison did "nothing to undermine the reasonableness of the California Supreme Court's findings and conclusions."

Hoyos timely appealed the district court's ruling.   We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a), and we affirm the district court's denial of Hoyos's *Batson* claim.   In a concurrently filed memorandum disposition, we affirm the remainder of the district court's judgment denying Hoyos's petition.

---

[6] Pursuant to 28 U.S.C. § 2254(d), a federal habeas court reviews the last reasoned state-court decision.   *See Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012).   We agree with the district court that the last reasoned state-court decision for purposes of Hoyos's petition is the California Supreme Court's ruling on automatic direct appeal.

II

We review de novo a district court's denial of habeas relief. *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019). Because Hoyos filed his federal habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs our review. *Id.*; Pub. L. No. 104-132, 110 Stat. 1214 (1996). Pursuant to AEDPA, our review of the challenged state-court decision must apply "a statutory presumption of correctness." *Currie v. McDowell*, 825 F.3d 603, 609 (9th Cir. 2016). We do not defer to the state court's decision if it was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented" in the state proceedings. 28 U.S.C. § 2254(d)(1)–(2).

A *Batson* claim may implicate either prong of § 2254(d). *McDaniels v. Kirkland*, 813 F.3d 770, 775 (9th Cir. 2015) (en banc). Hoyos argues the California Supreme Court's ruling on his *Batson* claim was an unreasonable application of Supreme Court precedent within the meaning of § 2254(d)(1).

The state court's decision results in an unreasonable application of clearly established federal law when the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Cook v. Kernan*, 948 F.3d 952, 965 (9th Cir. 2020) (quoting *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000)); *see also Johnson v. Finn*, 665 F.3d 1063, 1068 (9th Cir. 2011) (addressing "whether the state courts applied the proper standard in determining whether [the petitioners] made a prima facie showing of racial discrimination"). The state

court's decision is contrary to clearly established federal law if it "'applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Cook*, 948 F.3d at 965 (alterations in original) (quoting *Williams*, 529 U.S. at 405–06). "Clearly established federal law" refers to the Supreme Court's holdings "as of the time of the relevant state-court decision." *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019) (alterations omitted) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003)).

## III

"The 'Constitution forbids striking even a single prospective juror for a discriminatory purpose.'" *Foster v. Chatman*, 578 U.S. 488, 499 (2016) (quoting *Snyder v. Louisiana*, 552 U.S. 472, 478 (2008)). *Batson v. Kentucky*, 476 U.S. 79 (1986), established a three-step framework for trial courts to use to evaluate claims that a prosecutor's peremptory strikes were racially discriminatory, *id.* at 96.

> First, the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once the defendant has made out a prima facie case, the burden shifts to the State to explain adequately the racial exclusion by offering permissible race-neutral justifications for the strikes. Third, if a race-neutral explanation is tendered, the trial court must then decide

> whether the opponent of the strike has proved
> purposeful racial discrimination.

*Johnson v. California*, 545 U.S. 162, 168 (2005) (alterations, internal quotation marks, and citations omitted). This appeal involves Step One of *Batson*'s three-part test.

*Batson* was designed to provide "*actual* answers to suspicions" about racial bias, and the Supreme Court's decision in *Johnson* cited with approval our court's understanding that "it does not matter that the prosecutor might have had good reasons . . . [w]hat matters is the real reason [jurors] were stricken." *Id.* at 172 (first alteration in original) (quoting *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004)); *see also Currie v. McDowell*, 825 F.3d 603, 610 (9th Cir. 2016). Thus, once a defendant demonstrates an inference of racial discrimination, a trial court must give the prosecutor an opportunity to explain his actual reasoning. *See Johnson*, 545 U.S. at 168. In Hoyos's case, the trial court found the defendants had not made a prima facie showing at Step One and did not ask the prosecutor to state his reasons for striking Margaret A., Lisa H., and Yolanda M.

Hoyos argues the California Supreme Court's decision was an unreasonable application of *Johnson* because the state court "engaged in the prohibited exercise of reviewing the trial court record regarding the struck jurors and identifying colorable reasons why the prosecutor might have legitimately struck the three jurors." The State argues the California Supreme Court's decision was neither contrary to, nor an unreasonable application of, United State Supreme Court precedent. The district court concluded the California Supreme Court's ruling was not "erroneous or unreasonable."

The defendant bears the burden at *Batson* Step One to "produc[e] evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170. In *Johnson*, the Supreme Court held that California state courts "had been wrong to require *Batson* claimants to show a 'strong likelihood' of discrimination at Step One" and "reiterated that a defendant makes out a prima facie case if he produces evidence sufficient to support a 'reasonable inference' of discrimination." *Shirley v. Yates*, 807 F.3d 1090, 1101 (9th Cir. 2015) (quoting *Johnson*, 545 U.S. at 166–67).[7]

This court has repeatedly interpreted *Johnson* to mean that, at Step One, "the existence of grounds upon which a prosecutor *could* reasonably have premised a challenge does not suffice to defeat an inference of racial bias." *Currie*, 825 F.3d at 609 (alterations omitted) (quoting *Johnson v. Finn*, 665 F.3d 1063, 1069 (9th Cir. 2011)); *see also Williams v. Runnels*, 432 F.3d 1102, 1108 (9th Cir. 2006). For example, in *Currie* we held that the California Court of Appeal violated clearly established federal law when it affirmed a trial court's Step One denial of a *Batson* motion because the trial court only scanned the record for "grounds upon which the prosecutor might reasonably have challenged

---

[7] The state trial court denied Hoyos's *Batson* motion in February 1994, nearly a decade before the Supreme Court decided *Johnson*. The last reasoned state-court decision is the California Supreme Court's ruling on Hoyos's direct appeal, which was entered in July 2007, after the Supreme Court decided *Johnson*. We consider the Supreme Court's decision in *Johnson* relevant for purposes of deciding whether the state court's decision violated clearly established federal law. *See Styers v. Ryan*, 811 F.3d 292, 297 (9th Cir. 2015) ("When a new constitutional rule is announced, its requirements apply to defendants whose convictions or sentences are pending on direct review or not otherwise final.").

the jurors in question, whether or not those were the [actual] reasons . . . ."  825 F.3d at 609 (internal quotation marks omitted); *see also Williams*, 432 F.3d at 1109 (holding state appellate court's determination "that the record contained evidence for each juror that would support peremptory challenges on non-objectionable grounds" did "not measure up" to Supreme Court precedent).

The California Supreme Court's decision in Hoyos's appeal conflicts with clearly established federal law articulated by the United States Supreme Court.  By citing *Johnson*, the state supreme court correctly identified the relevant and controlling Supreme Court authority, but the court applied that authority unreasonably by doing exactly what we have explained *Johnson* forbids:  the court scanned the record, articulated its own race-neutral reasons why the prosecutor may have exercised his peremptory strikes, and denied Hoyos's *Batson* claim on those grounds at Step One. *See Currie*, 825 F.3d at 609–10 (holding the state court violated clearly established federal law, announced by the Supreme Court in *Johnson*, by affirming the denial of a *Batson* claim after examining the trial record for "grounds upon which the prosecutor might reasonably have challenged the jurors in question").  To be sure, the California Supreme Court acknowledged that *Johnson* overruled California's prior "strong likelihood" standard and that *Batson* requires only an *inference* of racial bias at Step One.  But we have also recognized that a state court's decision conflicts with clearly established Supreme Court precedent when it scans the trial court record to identify race-neutral grounds for a prosecutor's use of peremptory strikes and relies on those reasons to deny a *Batson* challenge.  *See Currie*, 825 F.3d at 609.  Here, there is no doubt that the California Supreme Court employed the same methodology in Hoyos's case that

the state court applied in *Currie*, because the last reasoned decision in Hoyos's case unequivocally stated that the court would "affirm the [trial court's] ruling where the record suggests grounds upon which the prosecutor might reasonably have challenged the jurors in question." *See id.*; *Shirley*, 807 F.3d at 1102 (affirming the district court's ruling that the state court erred by looking for "grounds upon which the prosecutor might reasonably have challenged the jurors in question" at Step One (internal quotation marks omitted)).

Hoyos separately, and briefly, suggests the California Supreme Court violated clearly established federal law because it did not engage in comparative juror analysis. Hoyos did not argue for comparative juror analysis in the trial court or on direct appeal.[8] *Batson* requires courts to consider all relevant circumstances in the trial court surrounding a challenged peremptory strike, and we have said that comparative juror analysis is a helpful tool for a reviewing court to assess a *Batson* claim. *See, e.g.*, *McDaniels v. Kirkland*, 813 F.3d 770, 776–77 (9th Cir. 2015) (en banc). We have also said that a comparative juror analysis is generally "called for on appeal even when the trial court ruled that the defendant failed to make a prima facie showing at the first step of the *Batson* analysis." *Shirley*, 807 F.3d at 1102 n.9 (quoting *Boyd v. Newland*, 467 F.3d 1139, 1149 (9th Cir. 2006)); *see also Boyd*, 467 F.3d at 1149. But Hoyos cites no Supreme Court authority requiring a state court to conduct a comparative juror analysis at Step One.

---

[8] At the time of Hoyos's direct appeal, California did not require a comparative analysis on direct appeal, but it now does "if relied upon by the defendant . . . ." *People v. Gutierrez*, 395 P.3d 186, 202 (Cal. 2017); *see also Ervin v. Davis*, 12 F.4th 1102, 1105 n.2 (9th Cir. 2021).

The California Supreme Court did not violate clearly established federal law by failing to conduct a comparative juror analysis at Step One, but it did unreasonably apply the Supreme Court's decision in *Johnson*. Accordingly, we review de novo Hoyos's *Batson* claim to determine whether he raised an inference of racial bias at Step One. *See Johnson v. Finn*, 665 F.3d 1063, 1070 (9th Cir. 2011).

## IV

To establish a prima facie case at *Batson* Step One, Hoyos bore the burden to show: (1) he is a member of a cognizable group; (2) the prosecutor removed members of that group; and (3) "the totality of the circumstances gives rise to an inference that the prosecutor excluded jurors based on race." *United States v. Esparza-Gonzalez*, 422 F.3d 897, 904 (9th Cir. 2005); *Boyd*, 467 F.3d at 1146–47 (explaining the defendant bears the burden to establish an inference of discrimination "in light of the 'totality of the relevant facts'" (quoting *Batson*, 476 U.S. at 94)). The parties do not dispute that Hoyos met his burden as to the first two elements: it is undisputed that Hoyos is a member of a cognizable group (i.e., Hispanic individuals) and that the prosecutor peremptorily removed members of that group. As for establishing an inference of bias, the Supreme Court has held that a defendant can make a prima facie showing "by offering a wide variety of evidence so long as the sum of the proffered facts gives 'rise to an inference of discriminatory purpose,'" *Johnson*, 545 U.S. at 169; *see also Finn*, 665 F.3d at 1071 (describing the defendant's burden at Step One as "minimal").

When analyzing whether a defendant raises an inference of discriminatory purpose at Step One, our role is to "analyze

the context in which the contested peremptory strike arose." *Boyd*, 467 F.3d at 1147. *Batson* requires that we "consider all relevant circumstances," 476 U.S. at 96, but we are mindful that consideration of the relevant circumstances is not the same as conjuring up our own "race-neutral reasons" for the prosecutor's challenges, *Finn*, 665 F.3d at 1071. The focus in *Batson* is always on discerning the prosecutor's "actual" reason for striking the challenged jurors. *Johnson*, 545 U.S. at 172; *see also Currie v. McDowell*, 825 F.3d 603, 610 (9th Cir. 2016).

## A

As in the California Supreme Court, Hoyos argues that his equal protection rights were violated because the prosecutor struck "all three Hispanic female prospective jurors." Though the Supreme Court has never extended *Batson* to include gender, the California Supreme Court characterized Hoyos's challenge as arguing "the prosecutor struck three of the only four Hispanics called to serve on the jury." It is clear the prosecutor used peremptory challenges to strike three Hispanic members of the venire, but the statistical comparison between the prosecutor's use of peremptory challenges to strike Hispanic and non-Hispanic members of the venire depends on whether we include Margaret A. in the calculation, and also on whether we take a snapshot of the jury-selection proceedings when the *Wheeler*/*Batson* motion was made, or at the time the trial court heard argument on that motion.

The prosecutor had used peremptory challenges to strike two prospective Hispanic jurors when Alvarado's counsel first moved pursuant to *Wheeler*: Margaret A. and Lisa H. While the trial court was selecting alternates, the prosecution

struck Yolanda M.  The court heard argument on the *Wheeler*/*Batson* motion after the jury and the alternates were selected.  Hoyos does not identify the total number of Hispanics in the venire, but from a comment made by the prosecutor during the *Wheeler*/*Batson* hearing, it appears there were a total of five Hispanic prospective jurors.  One of the five was seated as a juror, and one of the five was seated as an alternate.[9]  The prosecutor exercised peremptory challenges to excuse the other three.  By the time the *Wheeler/Batson* motion was argued, the prosecutor had exercised a total of seventeen peremptory challenges, and it had thirteen peremptory challenges remaining.

Of the three struck prospective Hispanic jurors, we first consider Margaret A.  Both the prosecutor and Hoyos's counsel argued that Margaret A.'s difficulty with English would impede her ability to serve as a juror, and Hoyos's counsel was the first to challenge her for cause.  Margaret A. was forthcoming regarding the fact that Spanish was her first language and English was her second.  The trial court found her to be "relatively articulate," but acknowledged that she had difficulty explaining the meaning of some words in English.  For example, she said she understood the words "aggravating" and "mitigating" but could not explain their meaning in her own words.  In response to the court's question, Margaret A. said she would likely "let it kind of pass" rather than raising her hand if there was a word she did not understand in the trial.

---

[9] That one Hispanic veniremember was eventually seated as a juror and one was seated as an alternate "does weigh against an inference of discrimination, but 'only nominally' so." *Shirley v. Yates*, 807 F.3d 1090, 1102 (9th Cir. 2015) (quoting *Montiel v. City of Los Angeles*, 2 F.3d 335, 340 (9th Cir. 1993)).

We are not left to guess at the basis for counsels' concern regarding Margaret A.  In his attempt to have Margaret A. removed, Hoyos's counsel explained, "the specific thrust of my problem with her is that no matter what she understands, she couldn't communicate that to any other jurors in deliberations and would likely be intimidated or a non-entity in deliberations."  The prosecutor joined the motion to remove Margaret A. for cause, noting she would be "very reluctant to raise her hand and say I don't understand something."

The trial court declined to excuse Margaret A. for cause, but the trial-court transcript leaves no doubt about the basis for the prosecutor's objection.  As the court recognized, Margaret A. clearly demonstrated difficulty with understanding some of the vocabulary used during the proceeding, and the prosecutor's joinder in Hoyos's unsuccessful attempt to have Margaret A. excused for cause due to her difficulty with English significantly undercuts Hoyos's argument that the prosecutor's use of a peremptory challenge raised an inference of racial bias at Step One.  A comparison of Margaret A. to the seated jurors does nothing to alter our conclusion.  Hoyos does not identify a non-Hispanic and non-struck juror with language difficulty comparable to Margaret A.'s, nor is one apparent from our review of the record.  *Cf. Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019) (explaining that a comparison of struck prospective jurors of one race and non-struck jurors of another race is one type of evidence a defendant can produce to support a prima facie showing).  On de novo review, we agree with the California Supreme Court that the exclusion of Margaret A. did not give rise to an inference of bias.

## B

Next, we turn to the prosecutor's use of peremptory strikes to remove Lisa H. and Yolanda M. from the venire. Hoyos argues that his showing at Step One "is a virtual clone of that found sufficient in *Shirley*" and suggests the number of peremptory strikes the prosecutor used, alone, was sufficient to raise an inference of racial bias at Step One. We disagree.

In *Shirley*, we said that "[t]he fact that a prosecutor peremptorily strikes all or most veniremembers of the defendant's race . . . is often sufficient on its own to make a *prima facie* case at Step One." 807 F.3d at 1101. Based on statistical percentages alone, we have found an inference of discrimination where the prosecutor peremptorily struck fifty-percent or more of the minority veniremembers. *See, e.g.*, *Fernandez v. Roe*, 286 F.3d 1073, 1078 (9th Cir. 2002) (57%); *Turner v. Marshall*, 63 F.3d 807, 813 (9th Cir. 1995) (56%), *overruled on other grounds by Tolbert v. Page*, 182 F.3d 677, 685 (9th Cir. 1999) (en banc); *cf. Shirley*, 807 F.3d at 1101–02 (finding an inference of discrimination at Step One because 67% of black veniremembers were struck and based on a comparison of a struck black veniremember with a seated white veniremember). That said, the Supreme Court has never held that a prima facie showing requires a particular statistic or even a pattern because "[i]n the eyes of the Constitution, one racially discriminatory peremptory strike is one too many." *Flowers*, 139 S. Ct. at 2241.

We found a prima facie inference of racial bias at Step One in *Shirley* where the prosecutor peremptorily struck two out of three eligible black veniremembers, 807 F.3d at 1101,

but Hoyos overlooks that the inference of racial bias in that case was strongly supported not only by the defendant's statistical showing but also "by a comparison between one of the black veniremembers who was struck . . . and a white veniremember who was seated," *id.* at 1102. Both prospective jurors were in their early twenties, both lived with their parents, and both were employed. *Id.* at 1099, 1102. Although the prosecutor noted that the seated juror had "significant responsibilities . . . and would be involved in decision-making," the excused black juror had "said she was eager to be a juror," "would follow the law faithfully," and "had experience making 'tough calls.'" *Id.* We concluded the two veniremembers "were certainly similar enough— apart from race—to help support an inference" of discrimination. *Id.* at 1102.

In the state trial court, defense counsel's argument in support of the *Wheeler/Batson* motion was brief: counsel's argument was limited to highlighting that the prosecutor had removed three prospective Hispanic jurors by exercising peremptory strikes and observing that defendants were of the same cognizable class. In all, the prosecutor used three peremptory challenges to remove Hispanic members of the venire. Whether the relevant denominator is four or five veniremembers depends on whether we assess the number of prospective jurors at the time the motion was made or at the time the motion was argued. Including Margaret A., the prosecutor had used peremptory strikes to remove two out of four potential Hispanic jurors at the time the motion was made. But the prosecutor's use of peremptory strikes could be counted as three out of five, because by the time the motion was heard, five prospective Hispanic veniremembers had been questioned by counsel and the prosecutor had used

peremptory strikes to remove three of them.[10] Either way we count it, this case is not a virtual clone of *Shirley*.

Nevertheless, the percentage of Hispanic prospective jurors struck in this case is akin to the cases cited in *Shirley*, and we assume without deciding that striking two out of four prospective jurors *or* three out of five veniremembers could support a prima facie showing of discrimination. We recognize that "such a presumption [may] be dispelled by other relevant circumstances" if the circumstances "do more than indicate that the record would support race-neutral reasons for the questioned challenges." *Williams v. Runnels*, 432 F.3d 1102, 1107–08 (9th Cir. 2006); *see also Boyd v. Newland*, 467 F.3d 1139, 1146–47 (9th Cir. 2006) (explaining "a court must analyze the context in which the contested peremptory strike arose"). In this case, the first reason the other relevant circumstances "do more" is that Hoyos's statistical analysis begins by including a juror he attempted to remove himself.

In *Flowers*, the Supreme Court listed a variety of evidence a defendant can use to support an inference that a prosecutor's peremptory strikes were racially motivated, including: (1) evidence that the prosecutor disparately questioned jurors of one race compared to another; (2) "side-by-side comparisons" of struck jurors of one race and jurors who were not struck; and (3) "other relevant circumstances that bear upon the issue of racial discrimination." 139 S. Ct. at 2243 ("Our precedents allow criminal defendants raising *Batson* challenges to present a variety of evidence to support

---

[10] Removing Yolanda M. was not necessarily harmless because one alternate was ultimately called to serve on the jury.

a claim that a prosecutor's peremptory strikes were made on the basis of race.").

Hoyos makes no argument that the prosecutor disparately questioned prospective Hispanic jurors compared to non-Hispanic jurors, and our de novo review does not reveal any such discrepancy in the questioning. We also note that the prosecutor used only about eighteen percent of his total peremptory challenges to strike Hispanic veniremembers compared to other cases where the prosecutor has used a sufficiently higher percentage, *see, e.g.*, *Paulino v. Castro*, 371 F.3d 1083, 1091 (9th Cir. 2004) (explaining the prosecutor used over 83% of his peremptory strikes against black veniremembers), and although two additional Hispanic veniremembers remained, the prosecutor did not exhaust all of his allotted peremptory challenges.

We have recognized that trial courts are often "well-situated to decide the [Step One] question without conducting a formal comparative juror analysis because the trial court has had access to the juror questionnaires and has been intimately involved in the jury selection process." *Murray v. Schriro*, 745 F.3d 984, 1005 (9th Cir. 2014). But "[w]hen an appellate court must decide whether the trial court that denied a *Batson* motion should instead have drawn 'an inference that discrimination . . . occurred,' *Batson* supports the use of comparative juror analysis" at Step One. *Boyd*, 467 F.3d at 1151 (omission in original) (internal citations omitted) (quoting *Johnson*, 545 U.S. at 170); *see also McDaniels v. Kirkland*, 813 F.3d 770, 778–79 (9th Cir. 2015) (en banc) ("A comparative analysis of the treatment of jurors may . . . be central to a federal court's review of whether a state court's findings as to purposeful discrimination were reasonable, regardless of the fact that the state court was not required by

clearly established law to perform such comparisons.");
*Crittenden v. Ayers*, 624 F.3d 943, 956 (9th Cir. 2010)
("[C]omparative juror analysis may be employed at step one
to determine whether the petitioner has established a prima
facie case of discrimination.").

Accordingly, we engage in a comparative juror analysis
on appeal to consider the side-by-side comparison of struck
jurors and non-struck jurors and other relevant circumstances
bearing upon the issue of racial discrimination. Comparative
juror analysis involves "an examination of a prosecutor's
questions to prospective jurors and the jurors' responses, to
see whether the prosecutor treated otherwise similar jurors
differently because of their membership in a particular
group." *Boyd*, 467 F.3d at 1145.

In Hoyos's case, a comparison of the struck jurors to the
seated jurors undermines any inference of racial bias. Just as
Hoyos failed to identify a seated juror with language
difficulties similar to Margaret A., Hoyos does not point to
any other member of the venire who voiced a religious
conviction comparable to Yolanda M.[11] *See Flowers*, 139 S.
Ct. at 2238 ("The attorneys may challenge prospective jurors
for cause, which usually stems from a potential juror's
conflicts of interest or inability to be impartial."). The juror
questionnaire asked whether the case was "one on which
[she] would like to serve as a juror," and Yolanda M. wrote:
"I don't feel I could be part of a jury, if they impose the death

---

[11] Dolores R. wrote on her juror questionnaire that she was "a
practicing Catholic for the first half of [her] life [and] believed that the
taking of any life for any reason was wrong." But she also wrote: "I now
feel that for certain crimes there are some who do not deserve to live" and
otherwise expressed no reservations based on religion.

penalty." In response to the judge's questions during voir dire, Yolanda M. clarified that her "strong religious beliefs" would make it difficult for her to impose the death penalty. She explained, "That's just the way I feel. That [the death penalty] actually shouldn't happen . . . I just don't feel I would be able to judge somebody feeling that way." Yolanda M. also expressed that "because of [her] strong beliefs," she "would choose the other [option] rather than the death penalty." The prosecutor unsuccessfully challenged Yolanda M. for cause before he exercised a peremptory strike to remove her, and as was the case with Margaret A., the reasons he gave in support of his for-cause challenge provide contemporaneous indication of his reasoning. The prosecutor argued that he did not "believe that [Yolanda M.] truly would be able to impose the death penalty," given her answers on the juror questionnaire.

The views Lisa H. expressed on her juror questionnaire and during questioning were also qualitatively different than those expressed by seated jurors, although the analysis of her challenge is the most difficult of the struck prospective jurors because we cannot discern from the record whether the prosecutor also challenged her for cause. Yet unlike any of the non-Hispanic seated jurors that Hoyos identifies, Lisa H. wrote on her questionnaire that she was "not certain what benefit [the death penalty] does for society," and she volunteered during voir dire that she "tend[ed] to side with the [sic] life in prison as opposed to death penalty." The judge asked Lisa H. whether she could keep "an open mind" and whether she "would be capable of" returning a verdict for death. Although she said, "I think I could be fair and open minded," she persistently gave qualified answers to the judge's questions, such as "I would have to be real convinced it outweighed it heavily." When the prosecution questioned

her, Lisa H. said she would place the burden on the prosecution to convince her one way or another about returning a death verdict, contrary to the court's instruction, and only later clarified that she was "incorrect" about the burden. Hoyos does not identify another non-struck, non-Hispanic juror who expressed such qualifications about imposing a sentence of death compared to a sentence of life in prison.[12]

In his federal habeas petition, Hoyos offered a comparative juror analysis for the first time and his briefs on appeal point us to three non-Hispanic members of the venire who were seated on the jury: Jimmy C., Dolores R., and Kirsten T. Hoyos contends that, as prospective jurors, all three articulated reservations about the death penalty that were equivalent to those of struck jurors Lisa H. and Yolanda M. Hoyos suggests the fact the prosecutor did not strike these three non-Hispanic jurors, but did strike Lisa H. and Yolanda M., demonstrates an inference of racial bias. We are not persuaded.

Unlike Lisa H. and Yolanda M., Jimmy C. never hesitated about his willingness to apply the death penalty. In response to a question on the juror questionnaire that asked whether

---

[12] The trial court cautioned the jury that the trial involved allegations that two victims had been fatally shot, and Lisa H. expressed that she was "affected" by the recent drive-by shooting and death of the companion of "a very very close friend." In light of Lisa H.'s continued reservations about the death penalty, we recognize that this experience could be interpreted as either mitigating or contributing to the prosecution's incentive to challenge Lisa H. as a prospective juror. Regardless of the effect in this particular case, we note that Hoyos does not identify another non-struck, non-Hispanic juror who disclosed the experience of having a close family member or friend killed as a result of gun violence.

"there are any circumstances where a person convicted of murder should *automatically* receive the death penalty," Jimmy C. answered: "In a case of a crime againts [sic] the United States such as the Rosenburgs [sic] spy trial or the killing of a president." He was asked to elaborate on his answer during voir dire, and he said that he "would weigh the evidence and give the death penalty only in the case of a very serious crime," but would not consider the death penalty warranted "if some man just robbed a bank . . . unless he might have killed someone in the process." There is no indication that Jimmy C. tended to side with life in prison over the death penalty nor that he expressed religious beliefs that would impair his ability to impose the death penalty, like Lisa H. and Yolanda M. Jimmy C.'s questionnaire and responses during voir dire suggested he would weigh the evidence and impose the death penalty if warranted.

Hoyos argues that the inclusion of Dolores R., a non-Hispanic juror, gives rise to an inference of racial bias because she agreed with Alvarado's counsel's statement that the death penalty should be reserved for the "worst of the worst," and in doing so she expressed reluctance to impose the death penalty that Hoyos likens to the hesitation expressed by Lisa H. and Yolanda M. The views Dolores R. expressed are readily distinguishable. She first explained during voir dire that, "What I really believe is that we have the death penalty, it's part[] of our law so it's reserved for certain punishments . . . and that's what makes our system work." Alvarado's counsel asked Dolores R. several follow-up questions, including one leading question about whether the death penalty "should be reserved for the very worst of the worst, so to speak?" Dolores R. responded, "It's the worst penalty, so I guess, you know, I would feel that way because that's as bad as it can get as a penalty." Hoyos

overlooks that Dolores R. also explained her view that the death penalty is "there to be used if the situation warrants the use of the death penalty" and "that's what makes our system work." And unlike Yolanda M., there is no indication in the record that Dolores R. had religious reservations about the death penalty nor did she consistently express hesitation about her ability to impose the death penalty, like Lisa H. The record does not support a finding that Dolores R. had the same reservations about the death penalty as Lisa H. and Yolanda M.

Kirsten T. expressed in her questionnaire that the death penalty "fills [her] with trepidation," but she also wrote that she thought "unfortunately for me, I'd be a good juror," and she demonstrated no hesitation during voir dire about imposing the death penalty. To the contrary, she said she could make the decision to impose the death penalty, and expressed that she "could live with that."

Hoyos also briefly refers to juror Brian E. as a comparator. Brian E.'s disclosures during voir dire were similar to Kirsten T.'s. He told counsel during voir dire that he "absolutely" understood the jury may be forced "to make the individual choice between life and death were either or both defendants convicted of first-degree murder with special allegations." He said "it would be an extremely difficult decision to make" but "that it's a decision that would have to be made if the proceedings got to that stage." The record does not support a finding that Kirsten T.'s or Brian E.'s views were comparable to those of Lisa H. and Yolanda M. regarding the death penalty.

Based on the record before us and on de novo review, Hoyos has not raised an inference of discrimination. Pursuant

to *Batson*'s three-step framework, we cannot say the California Supreme Court erred by ruling that Hoyos did not make a sufficient prima facie showing to shift the burden to the prosecutor to explain the actual motivation for the peremptory challenges.[13]

V

The California Supreme Court violated clearly established federal law by unreasonably applying the United States Supreme Court's decision in *Johnson* at Step One of Hoyos's *Batson* challenge. But on de novo review, we affirm the

---

[13] We recognize that one sentence of the trial court's ruling is arguably ambiguous: "Some attempt to exclude Hispanics, that doesn't seem to be the case at all in each of these cases." Hoyos does not identify this sentence as an error in the trial court's ruling, and he makes no argument based on this sentence. *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 ("[C]ourts . . . wait for cases to come to [them], and when [cases arise, courts] normally decide only questions presented by the parties.") (alterations in original) (internal quotation marks and citation omitted). In isolation, this sentence could be read to suggest the trial court found *some* attempt to exclude Hispanics. But read in the context of the trial court's entire ruling—including the immediately preceding and following sentences—this sentence does not suggest the trial court found any inference of discrimination. The immediately preceding sentence states, "It seems to me that there really isn't anything from which I could reasonably find the exercise of peremptories based upon race." The immediately following sentence reads: "It seems to me that a reasonable individual would be inclined to perhaps exclude these jurors on matters solely independent of race." Nothing in our opinion should be read to suggest that even *some* attempt to exclude a prospective juror on the basis of race could survive a *Batson* challenge.

district court's denial of Hoyos's *Batson* claim because Hoyos did not meet his burden of showing of an inference of discrimination.

**AFFIRMED.**

---

IKUTA, Circuit Judge, with whom BUMATAY, Circuit Judge, joins, concurring:

Today we hold that the California Supreme Court's rejection of Hoyos's *Batson* claim was an unreasonable application of clearly established Supreme Court precedent, which relieves us of deference to the state court's opinion under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d). But this holding is untrue. In fact, there is no Supreme Court case squarely on point. Instead, there is a Ninth Circuit opinion that merely *claims* our circuit rule is clearly established Supreme Court precedent. We have taken similarly misleading positions many times in the past, and just as many times the Supreme Court has reversed us after a scolding. *See, e.g.*, *Glebe v. Frost*, 574 U.S. 21, 24 (2014) (per curiam) (rejecting the Ninth Circuit's attempt "to get past" the rule that circuit precedent is not clearly established Federal law "by claiming that circuit precedent could help . . . determine what law is clearly established." (cleaned up)). Nevertheless, because we are bound by our circuit precedent, regardless how wrongheaded, I join the opinion's analysis in full.

I

Our review of the California Supreme Court's decision in this case is subject to AEDPA, which requires us to defer to a state court unless its proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

An "unreasonable application" of a Supreme Court case occurs where "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). This standard requires that the state court's application be "objectively unreasonable," rather than merely "incorrect or erroneous." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

For purposes of AEDPA, "clearly established Federal law" in § 2254(d)(1) is limited to the Supreme Court's "decisions as of the time of the relevant state-court decision,'" *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412), and "includes only 'the holdings, as opposed to the dicta, of [the Supreme] Court's decisions,'" *White v. Woodall*, 572 U.S. 415, 419 (2014) (quoting *Howes v. Fields*, 565 U.S. 499, 505 (2012)). To be "clearly established Federal law," the Supreme Court's opinion must "'squarely address[ ]' the claim at issue and provide[ ] a 'clear answer.'" *Walden v. Shinn*, 990 F.3d 1183, 1195 (9th Cir. 2021) (quoting *Yun Hseng Liao v. Junious*, 817 F.3d 678, 689 (9th Cir. 2016)). "[I]t is not an unreasonable application of clearly established Federal law

for a state court to decline to apply a specific legal rule that has not been squarely established" by the Supreme Court. *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (cleaned up). As we have summed it up, "when a state court may draw a principled distinction between the case before it and Supreme Court caselaw, the law is not clearly established for the state-court case." *Murdoch v. Castro*, 609 F.3d 983, 991 (9th Cir. 2010) (en banc).

The Supreme Court has "repeatedly emphasized" that "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court,'" *Glebe*, 574 U.S. at 24, and has rejected the Ninth Circuit's multiple efforts to sidestep this principle. For instance, in *Marshall v. Rodgers*, the Court rejected the Ninth Circuit's "mistaken belief that circuit precedent may be used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the] Court has not announced." 569 U.S. 58, 61 (2013); *see also Glebe*, 574 U.S. at 24 (rejecting the Ninth Circuit's reliance on two circuit precedents to "get past" the rule that circuit precedent does not constitute "clearly established Federal law"); *Lopez v. Smith*, 574 U.S. 1, 5, 7 (2014) (rejecting the Ninth Circuit's attempt to "evade th[e] barrier" of the rule by relying on Ninth Circuit precedent that it claimed "faithfully applied the principles enunciated by the Supreme Court"). In other words, if prior Supreme Court decisions do not clearly entitle the petitioner to relief, then the state court's decision cannot be an unreasonable application of Supreme Court precedent, regardless of whether our circuit precedent has directly addressed the issue. *See Kernan v. Cuero*, 138 S. Ct. 4, 9 (2017) (per curiam).

Nevertheless, as the Supreme Court recognized, "an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent." *Marshall*, 569 U.S. at 64 (citations omitted). Thus, we are bound by prior Ninth Circuit precedent to the extent it holds that a rule has been clearly established by Federal law as determined by the Supreme Court, even if that precedent was plainly wrong.

## II

The California Supreme Court rejected Hoyos's *Batson* claim partly on the basis that "the record discloses race-neutral grounds for the prosecutor's peremptory challenges." *People v. Hoyos*, 41 Cal. 4th 872, 901 (2007) (citation omitted), *abrogated by People v. McKinnon*, 52 Cal. 4th 610 (2011). Hoyos claims this constitutes an unreasonable application of the Supreme Court's decisions in *Johnson v. California*, 545 U.S. 162 (2005), and *Miller-El v. Dretke*, 545 U.S. 231 (2005).

To analyze this question, we first briefly identify the applicable Supreme Court precedent. The Court first set forth a three-step process for determining whether a prosecutor impermissibly struck potential jurors based on race in *Batson v. Kentucky*, 476 U.S. 79 (1986). First, the defendant must "make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93–94 (citation omitted). "In deciding whether the defendant has made the requisite showing [at step one], the trial court should consider all relevant circumstances." *Id.* at 96. "Once the defendant makes [the requisite] showing," the court moves to the second

step, and "the burden shifts to the State to come forward with a neutral explanation for" the challenges. *Id.* at 97. And at the third step, "[t]he trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98.

The Court refined its analysis of the first step of the prima facie case in *Johnson v. California*, 545 U.S. 162, which rejected California's procedures for determining whether a defendant made a prima facie case of discrimination as inconsistent with *Batson*. Under California's procedures at the time, the defendant had to show a "strong likelihood" that jurors were being challenged on discriminatory grounds. *See id.* at 165 (quoting *People v. Johnson*, 30 Cal. 4th 1302, 1307 (2003)). In *People v. Johnson*, the California Supreme Court had held that a "strong likelihood" standard for a prima facie case of discriminatory intent was consistent with *Batson*, and therefore at the first step, "the objector must show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias." *Johnson*, 30 Cal. 4th at 1318. Applying the "more likely than not" standard, the California Supreme Court concluded that the defendant had raised insufficient evidence of discriminatory intent, even though the trial court had thought the question of discrimination "was close." *Id.* at 1328.

The U.S. Supreme Court rejected this interpretation of *Batson* and reversed the California Supreme Court. *See Johnson*, 545 U.S. at 173. The Court held that "[w]e did not intend the first step [of *Batson*] to be so onerous" that the plaintiff would have to show that it "was more likely than not the product of purposeful discrimination." *Id.* at 170. Instead, "a defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial

judge to draw an inference that discrimination had occurred." *Id.* This requirement is satisfied by (1) the fact that the defendant "is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race"; (2) "the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate,'" and (3) "that these facts and *any other relevant circumstances* raise an inference that the prosecutor used that practice to exclude the veniremen . . . on account of their race." *Id.* at 169 (emphasis added) (quoting *Batson*, 476 U.S. at 96). Only at the third step would the trial judge determine whether it was "more likely than not" that the prosecutor had a discriminatory intent, because by then the "trial judge would have the benefit of all relevant circumstances, including the prosecutor's explanation." *Id.* at 170.

The burden at the first step is light, the Court explained, because *Batson's* three-step inquiry "is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process" through its three-step inquiry. *Id*. at 172. The trial court can avoid "needless and imperfect speculation" at the first step because "it does not matter that the prosecutor might have had good reasons [to challenge the jurors]" when the trial judge can get a "direct answer" from the prosecutor at step two, which will provide "the real reason they were stricken." *Id.* (quoting *Paulino v. Castro*, 371 F.3d 1083, 1090 (9th Cir. 2004)). Applying the correct standard at step one to the case before it, the Court held that the inference of discrimination raised by the defendant was "sufficient to establish a prima facie case under *Batson*," and proceed to step two. *Id.* at 173.

According to the Supreme Court's decision in *Johnson*, at the first step of the *Batson* inquiry, a trial court must determine only whether there is "evidence sufficient to permit the trial judge to draw an inference that discrimination ha[d] occurred," and did not have to determine whether it was "more likely than not" that the prosecutor struck prospective members of the jury for discriminatory reasons. *Id.* at 170. But the Supreme Court also reaffirmed that at the first step of *Batson*, the trial court may consider any "relevant circumstances" in determining whether the defendant made a prima facie case of discrimination. *Id.*

III

Our task is to determine whether the California Supreme Court's decision in this case was an unreasonable application of clearly established Supreme Court precedent in light of these principles. It was not.

In addressing Hoyos's claim that the trial court had erred in denying his motion at step one of the *Batson* procedure, the California Supreme Court correctly stated the legal standard under *Batson* and *Johnson*, and acknowledged that the Supreme Court had overruled California's prior ruling "requiring the defendant to 'show that it is more likely than not the other party's peremptory challenges, if unexplained, were based on impermissible group bias.'" *Hoyos*, 41 Cal. 4th at 900 (citation omitted). In response to Hoyos's argument that the trial court had likely used the erroneous "strong likelihood" standard at step one, the California Supreme Court stated that it would determine de novo under the correct standard "whether the record supports an inference that the prosecutor excused a juror on the basis of race." *Id.* at 901.

Reviewing the record without deference to the trial court, the California Supreme Court affirmed the trial court's ruling that Hoyos had not shown "that the totality of the relevant facts gives rise to an inference of discriminatory purpose" at step one. *Id.* at 900–01. The primary basis for this conclusion was its determination that "the record discloses race-neutral grounds for the prosecutor's peremptory challenges." *Id.* at 901. In considering the three prospective Hispanic jurors struck by the prosecutor, the California Supreme Court held that: (1) the prosecutor was entitled to excuse prospective juror Margaret A. based on concerns "about the prospective juror's English language skills," *id.* at 902; (2) there was a "race-neutral basis for a prosecutor's decision" to excuse Lisa H. because "[t]he record strongly suggests the prosecutor had grounds for concern about her possible bias against the death penalty, and on this basis was entitled to excuse her," *id.*; and (3) the record "suggests the prosecutor had reason for concern about Yolanda M.'s possible bias against the death penalty, and on this basis, he was entitled to excuse her," *id.* at 903. In short, the California Supreme Court concluded that the evidence produced by Hoyos at step one was insufficient "to permit the trial judge to draw an inference that discrimination had occurred," *Johnson*, 545 U.S. at 170, because the evidence in the record indicated that there were nondiscriminatory grounds for striking the Hispanic jurors.

No Supreme Court case at the time the California Supreme Court ruled clearly precluded a court from relying on evidence showing a nondiscriminatory basis for a peremptory strike. Rather, *Batson* and *Johnson* indicated that "the trial court should consider all relevant circumstances," including "the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges" which

"may support *or refute* an inference of discriminatory purpose." *Batson*, 476 U.S. at 96–97 (emphasis added); *see also Johnson*, 545 U.S. at 168–70. No doubt *Johnson* encouraged trial courts to avoid speculation about the *prosecutor's* reasons for striking a juror, and instead obtain the prosecutor's "direct answer" as to the reason for the strike. *Johnson*, 545 U.S. at 172; *see also Miller-El*, 545 U.S. at 251–52 (stating that after the *prosecutor* provides a reason for striking the juror (*i.e.*, step two), the judge must assess the plausibility of that reason, and "if the stated reason does not hold up," then it is pretextual even if the court "can imagine a reason that might not have been shown up as false"). But nothing in *Johnson* addresses the situation here, where the state court itself determined, based on its own review of the record, that there were good reasons for striking a juror, and that those reasons dispelled any inference of discriminatory purpose. *See Hoyos*, 41 Cal. 4th at 900–03. Therefore, the California Supreme Court's reasoning is not an unreasonable application of the Supreme Court's decisions in *Batson* and *Johnson*.

IV

Normally, our analysis would stop here, and we would defer to the California Supreme Court's decision in this case, as required by AEDPA. But we cannot do so here, because we are bound by our precedent.

Over the course of several cases, the Ninth Circuit developed a rule that a trial court may not deny a *Batson* motion at step one based on evidence of race-neutral reason for the peremptory strikes of prospective jurors. We started the process in *Williams v. Runnels*, 432 F.3d 1102 (9th Cir. 2006). In that case, we reviewed the defendant's *Batson*

challenge de novo, so we were not restricted to legal rules that had been clearly established by the Supreme Court. *Id.* at 1105. At step one of our *Batson* analysis, we held that the prosecutor's evidence "that the record would support race-neutral reasons for the questioned challenges" was insufficient to "rebut an inference of discriminatory purpose based on statistical disparity." *Id.* at 1108. *Williams* acknowledged, however, that this rule was not required by the Supreme Court, because "in some instances the evidence in support of race-neutral reasons for the peremptory challenges may dispel any inference of bias." *Id.* at 1109.

We elaborated on *Williams* in *Johnson v. Finn*, 665 F.3d 1063 (9th Cir. 2011). *Finn* held that a state court's rejection of the defendant's *Batson* challenge at step one was an unreasonable application of Supreme Court precedent because the state court had probably required the defendant to show a "strong likelihood" of discrimination, a standard rejected in *Johnson*. *Id.* at 1068. The "strongest evidence" supporting our suspicion that the state court had applied this erroneous "strong likelihood" standard was the state court's reliance on "grounds upon which a prosecutor could reasonably have premised a challenge." *Id.* Relying on *Williams*, we explained that such evidence was weak and "does not suffice to defeat an inference of racial bias at the first step of the *Batson* framework," *id.* at 1069, thus ignoring our statement in *Williams* that such evidence could defeat such an inference in some cases. Therefore, *Finn* concluded, the state court must have relied on the "strong likelihood" standard, which was contrary to *Batson*. *Id.*[1]

---

[1] *Finn* relied on *Batson* for this proposition, instead of *Johnson*, because the state court opinion in *Finn* had been issued before *Johnson* was decided. 665 F.3d at 1069.

Although *Finn* established a Ninth Circuit rule that a trial court may not deny a *Batson* motion at step one based on evidence supporting race-neutral reasons for the challenges, such "circuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court," *Glebe*, 574 U.S. at 24 (citations omitted), and so a state court's application of a rule contrary to ours would not constitute an unreasonable application of Supreme Court precedent.

But we transformed our circuit precedent into "clearly established Federal law" with a stroke of the pen in *Currie v. McDowell*, 825 F.3d 603, 609 (9th Cir. 2016). In *Currie*, a state trial court had denied the defendant's *Batson* motion at step one. *Id.* The state appellate court upheld the trial court's denial because "the record suggest[ed] grounds upon which the prosecutor might reasonably have challenged the jurors in question." *Id.* at 608. Reviewing the state appellate court's ruling through the lens of AEDPA, *Currie* held that it "violated clearly established Federal law in its *Batson* step one analysis." *Id.* at 609. *Currie* then announced that the principle stated in *Finn*— that "the existence of grounds upon which a prosecutor could reasonably have premised a challenge does not suffice to defeat an inference of racial bias at the first step of the *Batson* framework," *id.* (*quoting Finn*, 665 F.3d at 1069)—had been clearly established "by the Supreme Court's decision in *Johnson v. California*," *id.* at 609–10. According to *Currie*, the Supreme Court's decision in *Johnson* clearly established this rule because the Court "noted that '[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process,'" and "quoted with approval our statement in [*Paulino*] that '[i]t does not matter that the prosecutor might have had good

reasons . . . [;] [w]hat matters is the real reason they were stricken.'" *Id.* at 610 (quoting *Johnson*, 545 U.S. at 172).

*Currie* was clearly wrong. *Johnson* did not "'squarely address[ ]' the claim at issue" or "provide[ ] a 'clear answer,'" *Walden*, 990 F.3d at 1195, to the question whether a trial court may consider, as part of the relevant circumstances at step one, "[t]he existence of grounds upon which a prosecutor could reasonably have premised a challenge," *Currie*, 825 F.3d at 609 (emphasis omitted) (cleaned up). As explained above, *Johnson*'s statement that *Batson* "is designed to produce actual answers to suspicions and inferences" of discrimination explained why the "more likely than not" standard does not apply at step one, but instead applies after the prosecutor provides his reasons at step two. 545 U.S. at 170, 172. Similarly, *Johnson*'s statement that a trial court need not "engag[e] in needless and imperfect speculation when a direct answer can be obtained by asking a simple question" simply affirms that the court should proceed to step two and ask the prosecutor for his reasons once the defendant raises an inference of discrimination. *Id.* at 172. Neither of the quotes from *Johnson* on which *Currie* relied squarely establishes a "specific legal rule," *Mirzayance*, 556 U.S. at 122, or a "holding," *White*, 572 U.S. at 419, that a trial court can never consider the existence of race-neutral reasons for the prosecutor's strikes at step one of *Batson*. Rather, *Johnson* held only that a court may not apply a "strong likelihood" or "more likely than not" standard at step one. *See* 545 U.S. at 164–65.

In short, the California Supreme Court could "draw a principled distinction" between its ruling that the inference of discrimination could be dispelled by evidence in the record of

nondiscriminatory reasons for striking a juror, and the Supreme Court's holding in *Johnson*. *Murdoch*, 609 F.3d at 991. Therefore, *Currie*'s statement that the Supreme Court had clearly established a rule that precluded the California Supreme Court's decision was false. As stated by the dissent in *Currie*, "[w]e do not speak for the Supreme Court, even when we say the same thing twice." *Currie*, 825 F.3d at 621 (Bea, J., dissenting). The same is true now that we have said it thrice.

V

Although *Currie* falsely claimed to identify a "clearly established" rule in Supreme Court precedent, "a published decision of this court constitutes binding authority which 'must be followed unless and until overruled by a body competent to do so.'" *Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) (quoting *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir.2001)), *aff'd sub nom. Arizona v. Inter Tribal Council of Ariz. Inc.*, 570 U.S. 1 (2013). Therefore, we are bound by *Currie*'s holding, and must conclude that the California Supreme Court's procedure at step one of *Batson* was an unreasonable application of Supreme Court precedent. Luckily, in this case we reach the same conclusion as the California Supreme Court after reviewing the record de novo, and so our adherence to our erroneous precedent does not change the outcome.

Even so, our error in *Currie* must be recognized. Congress enacted AEDPA to ensure that federal courts honor foundational principles of federalism and comity by according deference to state court decisions unless they are unmistakably inconsistent with Supreme Court precedent. As the Supreme Court has made abundantly clear, our precedent

is not clearly established Supreme Court precedent, no matter how much we may pretend it is.  *See, e.g.*, *Glebe*, 574 U.S. at 24; *Lopez v. Smith*, 574 U.S. at 5; *Kernan*, 138 S. Ct. at 9. We should overturn *Currie* to correct this error before the Supreme Court corrects it for us.